UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
            V.           )        CR-05-30002-MAP
                         )
(1) FRANK DEPERGOLA, and )
(2) ARMANDO BOTTA,       )


GOVERNMENT'S TRIAL MEMORANDUM


Now comes the United States by and through its undersigned attorneys and presents this Honorable Court with the following memorandum of law regarding issues pertinent to this trial.

I.    INTRODUCTION

The defendants have been indicted on two counts of loansharking.[1] They were charged in Count One with conspiracy to violate 18 U.S.C. § 894 and in Count Two with a substantive violation of the same statute.

II.   EVIDENCE

The government will seek to introduce evidence of the extension of the loan and collection of the loan through the testimony of government witness Leone Daniele. Daniele will testify that at the time he obtained the loan from the defendants he understood that if he failed to repay the loan he could be threatened and eventually physically assaulted.

Daniele will further testify that at the time of the loan he understood that the defendants were loansharks and that the

_____

[1]Frank Depergola entered a change of plea on May 11, 2006.

1

defendants and unindicted co-conspirator Adolfo Bruno were members of and/or associated with organized crime. Finally the witness will testify regarding the terms and circumstances of the loan: $35,000 cash loan, $700 [2.0%] interest per week, no collateral posted and no documents signed to memorialize the loan.

Daniele will testify that he has borrowed money from three different loansharks.[2] In approximately 1996 Daniele borrowed $20,000 in cash, posted no collateral and was charged $200 per week in interest [1% per week or 52% per year] on the first loanshark loan. He borrowed the money to open a pizza shop. Again in 1996, the defendant needed money for a down payment on a home and he borrowed $35,000 in cash, posted no collateral and was charged $700 or 2% per week by Frank Depergola and Al Bruno. Finally, in 1997 Daniele wanted to open a second pizza shop and borrowed $30,000 in cash and posted no collateral and was charged $250 or just under 1% per week in interest from the third loanshark.

In May of 1999, Daniele was in dire straights. He had just been arrested for contempt of court for failure to pay motor vehicle fines and was incarcerated for a brief time in the Hampshire County House of Correction. His pizza shop located in Easthampton, had closed. Daniele owed money to all three loansharks with a total of $1,150 in weekly interest owed. Daniele

---

[2]The government will seek to introduce evidence regarding the names of the other two loansharks at trial, however because they have not been charged, the names are not mentioned in this memorandum.

decided to cooperate with law enforcement at that point.[3]

By January of 1999 (three months before Daniele began to cooperate), Daniele had stopped making payments on all three loans. Under the direction of the Massachusetts State Police (MSP), Daniele made two consensual recordings. Daniele was first interviewed by the FBI in June of 1999. By the fall of 2000, Daniele had managed to save enough money to open a new pizza shop in Westfield, Massachusetts. Once it became known that Daniele was back on his feet, all three loansharks demanded that Daniele resume payments on the loans described above. Daniele promptly relayed their demands to the FBI.

Thereafter, in May 2001, FBI agents placed a closed circuit television ("CCTV") and recording device in the back work room of Daniele's restaurant. Daniele consensually recorded conversations occurring in the back room of his pizza shop. Daniele had the ability to turn on the video/audio recorder when subjects of the investigation were with him in the work area. The CCTV operated from May 22, 2001, until May of 2002. During that period, Daniele was able to make surreptitious recordings of payments to Depergola, Botta, and Bruno. After the restaurant closed in the summer of 2002, Daniele wore an audio recording device and consensually recorded numerous additional conversations. Much of the evidence the government will offer at trial will come from the consensual electronic surveillance conducted over the CCTV and recording

---

[3]Daniele has been paid over $126,000 by the FBI for his cooperation.

device.

The evidence which the government will offer at trial which will prove that Bruno, Depergola and Botta participated in a conspiracy to collect extensions of credit by extortionate means and collected an extension of credit by extortionate means consists of the following: 1) tape recorded conversations among Bruno, Daniele and Depergola wherein the terms and payment of the usurious loan are discussed; 2) tape recorded conversations between Daniele and Botta wherein there is discussion of giving Botta payments intended for Depergola; 3) Daniele's testimony regarding the loan and subsequent repayments; 4) physical surveillance conducted by the FBI when payments to Depergola and Botta were made; and 5) telephone toll and pen register information.

Daniele will testify in September 1996, he borrowed approximately $35,000.00 from Depergola.[4]    Depergola was an associate of Al Bruno.  Daniele initially approached Victor Bruno, Al Bruno's son, in seeking the loan.  After Daniele discussed the amount needed with Victor Bruno, Depergola, who Daniele had never previously met, approached Daniele and provided him with $35,000 in cash.  Daniele did not post any collateral, signed no documents, received cash and was expected to make weekly interest payments in cash until he repaid the entire $35,000 in cash.

The agreement with Depergola was that Daniele would pay

---

[4] There is some discrepancy with respect to the amount of the loan.  Daniele testified before the grand jury that the loan was for $25,000.00 or $35,000.00.  However, on other occasions he has stated that the loan was for $35,000.00.

$700.00 per week in interest (2% per week or 104% per year) until he paid off the principal.  The legally enforceable maximum rate of interest in Massachusetts is 20%.  The principal had to be paid off in full in a lump sum.  Daniele will testify that his understanding at the time the loan was made was that because he was dealing with organized crime associates, if he failed to repay the loan, he could be threatened with violence and eventually harmed.

After approximately 19 months, Daniele stopped making payments.  Depergola responded by telling Daniele that he had to continue paying or something will happen.  At one point, Depergola forced Daniele to sign over his restaurant located in Easthampton as collateral.  Depergola also attempted to close the restaurant by removing equipment.  Daniele was able to stop Depergola only after he emptied the cash register and gave Depergola all of his available cash.

Meanwhile, Daniele was also falling behind on payments that he had been making to the other two loansharks.  Daniele testified that the situation was "getting out of hand," so he contacted one of the other loansharks and asked him to arrange a meeting with Bruno.  The meeting took place in the basement of the Caramia Restaurant in Springfield in June of 1998.  Prior to the meeting, Daniele was instructed to lift his shirt and drop his pants to ensure that he was not wearing a transmitter or tape recorder. Bruno then told Daniele that he had to keep paying and then "nothing will happen."  The two agreed that Daniele would pay $500 per month to Depergola and $500 per month to one of the other

loansharks.

Daniele paid the $500 per month to both Depergola and the other loanshark for approximately 6 or 7 months until January or February of 1999 and then stopped. Between June and December, 1999, Daniele lost his business and his home and declared personal bankruptcy. Daniele had no contact with Depergola or Bruno until the fall of 2000 when his financial situation had improved to the point that he was able to reopen a pizza restaurant in Westfield.

Daniele will testify that Depergola and Bruno visited him at his new restaurant in November or December of 2000, and told him that he would have to repay the loan. Daniele asked for some time until he started to build his business. Eventually Daniele and Bruno agreed that Daniele would pay $100 per week to satisfy the Depergola loan. Daniele then contacted the FBI. Shortly thereafter, in January, 2001, Daniele began to make consistent $200 bi-weekly repayments under the direction of the FBI. These payments were usually made to Botta, and occasionally to Depergola and Bruno at Daniele's restaurant. The FBI was able to video-record many of the payments made to Botta and some of the payments made to Depergola and Bruno.

The video recordings are compelling. For example, a video recording made on June 5, 2001, depicts Botta making arrangements with Daniele to collect payments every two weeks. On the same date, Daniele asked Botta to arrange a meeting between Depergola and Daniele. Botta told Daniele that he will see "Frankie" [Depergola] and inform him that Daniele wants to see him. The next

6

day, June 6, 2001, Depergola and Bruno visited Daniele at the restaurant. The video recording depicts Daniele, Bruno and Depergola discussing Daniele's loan. At one point, Daniele asked Bruno if he can make one lump sum payment to settle the debt. Bruno then suggests to Depergola that he should come up with a lump sum figure. Depergola responded that all Daniele had paid to date was "juice" (interest) and that Daniele still owed "thirty" or "thirty-five" (thousand). Pertinent portions of the June 6th conversation are as follows:

| | |
|---|---|
| Depergola: | Hey what's up? Third? All right. Ya. Okay. |
| Daniele: | A few more minutes boss. Al can I talk to you? I know (Unintelligible)right? I'm doing very well here. If I start to put some money to the side you know every month can you take care of me(Unintelligible). Can you do that for me? |
| Bruno: | Ya, well lets ask him. |
| Daniele: | No I don't you don't have to ask him now you know I don't wanna say some thing that (Unintelligible). |
| Bruno: | Frankie come here. |
| Daniele: | You know what I mean? I'm doing okay you know? Every month put a G note away and I come up to you and here here's ten, here's fifteen, come on. Give me a break. |
| Bruno: | Frankie listen |
| Depergola: | What. |
| Bruno: | He just told me. If he comes up with a little bit of lump sum. Can you take care of him? |
| Depergola: | A little what? |

7

Bruno:          (Unintelligible)

Daniele:        You know

Bruno:          Every month he's doing good right? Say
                he gave you like he gives you five ten
                G's.

Daniele:        Please do that for me.

Depergola:      Five, ten G's for what?

Daniele:        You know what ever it is. You know and
                that's it.

Bruno:          Whatever

Depergola:      Five ten G'S it's thirty?

Bruno:          No, no, no listen

Depergola:      What?

Bruno:          In other words say he comes up five, ten
                he gives you five, he gives you five when
                it gets to the end you take a few dollars
                off.

Daniele:        That's all I'm asking

Bruno:          What do think?

Depergola:      Well I don't even know where it's at now.
                It's like thirty what ever it is whatever
                he paid it's thirty five.

Daniele:        It's under thirty

Depergola:      What?

Daniele:        (Unintelligible)

Depergola:      Now? No

Daniele:        Listen (Unintelligible)

Depergola:      How many weeks you pay? Since January.

Daniele:        The money I gave you before to the
                twenty two, well look into it I don't
                write it down you know.

8

Depergola:      Then he took twenty-five hundred.

Daniele:        Right.

Depergola:      Ya, He never paid that

Daniele:        Two thousand. Two thousand I payed you over a G note.

Depergola:      You payed juice you never payed me the money in time.

Daniele:        Yes I did.

Bruno:          Look into it

Daniele:        Just look into it that's all I'm asking you know I work hard for my money If I can give you a nice chunk go ahead you know what I mean?

Bruno:          In other words at the end.

Daniele:        You know what the fuck.

Bruno:          He said he'll help out.

Daniele:        You know up and down I don't want any get myself hurt you know.  I just bought the ovens thank God I put down five G'S. I need a walk in freezer next. Soon as I pay for the ovens I get the freezer. The place is doing gold.

Bruno:          He'll work some thing out. We, he'll do it. I can't, you know, he's gotta do you know what I mean. I'm sure he will. If it's, if at the end at the end of the ball game you know there's a few here. He'll help you.  What the fuck but get the lump sum he can he won't strap us.

Depergola:      I don't know if it's it's not under thirty.

Bruno:           Well, Frankie We'll check into it. Look it

Daniele:        Same way with my brother in law. Remember that day over there at the pizza shop? Ba bump ba ba he did all the talking you were gonna do fifteen or

9

|  |  |
|---|---|
|  | twenty or some thing like that? |
| Depergola: | Who? |
| Bruno: | No |
| Daniele: | Hope he fucking dies tomorrow that cock sucker. |
| Bruno: | No, no, no |
| Daniele: | That's it. |
| Bruno: | Lee he'll do something for you. |
| Daniele: | Okay |
| Bruno: | He'll do some thing. But get the lump sum so that way when you come in with the money you know, right now it's like dead. |
| Daniele: | I been doing what I what you told me to do right? I been doing |
| Bruno: | Why are you looking at me like that? (Unintelligible)hook him up.  Whatta you think? |
|  | (Telephone Ringing) |
| Depergola: | Ya but I mean come up with the whole thing and end it ya. |
| Bruno: | Ya |
| Depergola: | Ah I mean how many? |
| Bruno: | No, no, no, no but if he gives you (Unintelligible) give it to me little odds and ends at the end |
| Daniele: | I gotta go out of my way to get some thing you give a number that's fair. Be fair with me please. |
| Bruno: | Let him look into it |
| Daniele: | That's all You know what I'm saying. That's all I ask. |
| Bruno: | He'll save you a few bucks. Hugh? |

10

Thereafter, on July 18, 2001, Depergola came to Daniele's restaurant to pick up a $200 payment.  This visit was similarly recorded by the CCTV.  At one point Daniele complains that he has paid seven every week and therefore wants a break.  Daniele is referring to the $700 per week he paid Depergola from September 1996 through early 1998.  Depergola has little sympathy for Daniele because, according to Depergola, the debt is seven years old.  The pertinent parts of the conversation are as follows:

| | |
|---|---|
| Daniele: | I don't know. |
| Depergola: | Who says this? |
| Daniele: | Cosimo. Told me I'm gonna have some visitors cuz they found out that I'm paying you and I didn't nobody okay. I don't know how |
| Depergola: | How does Cosimo know? |
| Daniele: | Hugh? How's he know, I don't know you tell me. He knows somebody. I did I did one thing right? I went back to all the shit that I've done I know that's the business what ever it is. You have all the right to say Leo go fuck yourself that's what you owe you gotta pay but (Unintelligible) knows all ready. |
| Depergola: | When? |
| Daniele: | Every week seven, seven, seven come on. Give me a break. I give you fifteen G'S |
| Depergola: | (Unintelligible) |
| Daniele: | That's an insult? No? Can you do better? No. I'll hustle I'll do what ever I got to do. I'll put it together. No. |
| Depergola: | I can't. It's been seven years. You know what I mean? |
| Daniele: | I know. Look at what I've been through. Lost my fucking eyes. I finally get I got |

11

|            |                                                                  |
|------------|------------------------------------------------------------------|
|            | my wife the ring back. I got the business back I got everything back I gave my family back together. Come on lets end this. Even with them guys they, their gonna ask for this the thirteen or what ever it is I make um an offer three or four and it's done. Of course there gonna take it. What else am I gonna do right? |
| Depergola: | (Unintelligible)                                                 |
| Daniele:   | I'm not gonna loose this fucking joint. No way. |
| Depergola: | I told you (Unintelligible)                                     |
| Daniele:   | All I am is surprised that fucking scum bag hasn't come around yet. |

In addition to obtaining video recordings of payments made by Daniele to Botta and Depergola, the FBI conducted surveillance whenever they had sufficient notice of Botta's visits. Also, Botta frequently used his cell phone to confirm collection visits with Daniele. Toll records and information obtained through the use of a pen register to record incoming and outgoing calls on Botta's cell phone will be offered into evidence by the government to corroborate Daniele's testimony regarding the bi-weekly payments.

There were at least ten video taped loan collections by Botta. The evidence also shows that Botta knew of the means to be employed by Depergola if Daniele failed to make a payment. On October 6, 2001, the following exchange between Botta and Daniele was recorded on the CCTV.

|          |                                                                  |
|----------|------------------------------------------------------------------|
| Daniele: | (Unintelligible) okay? (Unintelligible) Whatta you gonna muscle me that ah if I say no? |
| Botta:   | (Unintelligible) You know I gotta                                |
| Daniele: | I got obligations.                                               |

| | |
|---|---|
| Botta: | I gotta you know |
| Daniele: | If I say no that I can't make it whatta you why do you gotta say ya? |
| Botta: | Cuz I, I have to commit and I have to come up here I don't like talking on my phone. I don't like talking on my phone I hate talking on my phone. I don't like it I mean (Unintelligible) |
| Daniele: | I didn't say nothing I say can I see you Tuesday? And you just say I can't. |
| Botta: | I gotta come up Frankie will tell me you go up there and see him. He don't give it to you come back to me. I mean that, I'm just you know. |
| Daniele: | Here you go. Take it. Okay? |
| Botta: | You have no hard feelings with me? |
| Daniele: | No not at all buddy. Every thing will come down pretty soon. Okay buddy. (Unintelligible) |

Botta's response "you know I gotta" to Daniele's question: "Whatta you gonna muscle me that ah if I say so?" demonstrates Botta's knowledge regarding the consequence to Daniele if he fails to make his payments.

Finally, the investigation disclosed that Botta collected from more than one loanshark victim. During another recorded conversation, Daniele asked Botta if he had a lot of "stops" to make. Botta responded by implying that he had a few others.

Daniele continued to repay his loans from Depergola after his restaurant closed in September, 2002, however Botta was no longer involved. Like the prior payments, these payments were made under the supervision of the FBI. On most occasions, Daniele wore a recording device and was able to record conversations pertaining to

the payments.  For example, on August 27, 2002, Daniele made a $200 payment to Depergola under the supervision of the FBI.  As he handed the money to Depergola, Daniele said: "Here's a deuce."

Another compelling conversation was recorded on November 19, 2002.  On that day Daniele met Depergola at Vision Used Cars in order to make his $200 payment.  Daniele and Depergola discussed the length of the loan, "over six years."  In addition, Depergola said that he will take a loss on a lump sum payment if the other guy (Bruno) will agree to it.  Depergola further states that Daniele's balance is $28,000.

| | |
|---|---|
| Depergola: | Try to sell the car. |
| Daniele: | Frankie listen. I talked to the other guy. you know what I mean? |
| Depergola: | No. |
| Daniele: | I already spoke to him. (UNINTELLIGIBLE) you know. |
| Depergola: | You gotta do (UNINTELLIGIBLE) |
| Daniele: | Come on. |
| Depergola: | I told you no. |
| Daniele: | They been fucking good to me. |
| Depergola: | I can't. Just |
| Daniele: | Come on. |
| Depergola: | (UNINTELLIGIBLE) |
| Daniele: | Look how long it's been. You know. |
| Depergola: | Why your paying back the ah principle. What are you paying back on? Your not paying (UNINTELLIGIBLE)nothing. Your not getting hit with nothing. |
| Unknown Male #4: | What's the matter? |

14

Daniele:        Ya well what the fuck. I paid the last
                (UNINTELLIGIBLE)

Depergola:      Way you paid it's been two years. That's
                all you been doing is knocking it down
                for over two years now.

Daniele:        Two years.

Depergola:      Ya.

Daniele:        It's been six years.

Depergola:      Ya but two years it's been how long, for
                how long was anything was anything
                (UNINTELLIGIBLE)?

Daniele:        Are you willing to work with me though?

Depergola:      Ya We'll knock it down (UNINTELLIGIBLE)
                ya.

Daniele:        I got a number to offer you.

Depergola:      What is the number?

Daniele:        Probably ten G's.

Depergola:      No.

Daniele:        You won't even take ten? Wow.

Depergola:      The things gotta be about 28.

Daniele:        28?

Depergola:      Knock it down. Roughly maybe even more.
                You started, you haven't paid in how
                long?

Daniele:        The balance right now is 28?

Depergola:      (UNINTELLIGIBLE) ya

Daniele:        No. You better check

Depergola:      A hundred dollars a week.

Daniele:        No Frankie you better check the book.

Depergola:      And that hasn't even been you know
                consistent. Well listen we'll do

15

something. I wanna end it.

Daniele:        I'll take care of you. You know what I mean?

Depergola:      I wanna end it to. I wanna end it.

Daniele:        Me to.

During the course of the investigation, Daniele made over forty payments with respect to the loan from Depergola for a total of $8,200 in FBI funds.

The government will also call in it's case-in-chief New York FBI SA Michael A. Campi as the government's expert witness regarding loansharking and La Cosa Nostra (LCN). SA Campi has reviewed the transcripts and/or the recordings of the meetings among Daniele, Bruno, Depergola and Botta.

SA Campi will explain to the jury the definition of loansharking terms used in the recordings, such as vig, juice, off the top, and others. SA Campi to explain to the jury how the loansharking business works. SA Campi will testify that loanshark loans are made at usurious rates of interest, with no collateral and no documentation. He will testify that because collection of these loans is not enforceable through normal collection procedures including the court system, if a debtor fails to pay, threats and ultimately violence will be used to collect the loan. SA Campi will testify that the debtor must make weekly interest payments, that these weekly payments do not reduce the principle and that the principle must be paid off in a lump sum. He will testify that the loans and payments are made in cash. SA Campi will also testify that in his opinion the collections by both Depergola and Botta

16

from Daniele involve the use of extortionate means.

SA Campi will also testify regarding the LCN generally and the Genovese Family specifically. He will testify regarding Al Bruno's role and position within the LCN. SA Campi will testify regarding Bruno's role in the loan made to the Daniele and collected by Bruno, Depergola and Botta. He will testify that during the June 6, 2001, recorded meetings among Bruno, Frank Depergola and Daniele, that Bruno had the authority to require the parties to make an arrangement regarding repayment of the loan. SA Campi will also testify that loansharking in the Springfield area is controlled by members and associates of the LCN.

The government will also offer into evidence charts which summarize the results of a pen register on Botta's cell phone, a GPS device installed on Botta's car, and physical surveillances of Botta entering Daniele's pizza shop to collect on the loan.

III. LOANSHARKING STATUTES AND CASE LAW

This indictment alleges in Count One a conspiracy to violate Title 18 U.S.C. Section 894 and in Count Two alleges a substantive violation of the same statute. Because it is relevant for reasons set forth below, a discussion of 18 U.S.C. Section 892 is also included.

Section 892 states:

> (a) Whoever makes any extortionate extension of credit, or conspires to do so, shall be [punished]
>
> [An extortionate extension of credit is any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use

17

of violence or other criminal means to cause harm to the person, reputation, or property of any person. 18 U.S.C. §891(6)]

(b)  In any prosecution under this section, if it is shown that all of the following factors were present in connection with the extension of credit in question, there is prima facie evidence that the extension of credit was extortionate, but this subsection is nonexclusive and in no way limits the effect or applicability of subsection (a):

   (1)  The repayment of the extension of credit, or the performance of any promise given in consideration thereof, would be unenforceable, through civil judicial processes against the debtor
      (A) in the jurisdiction within which the debtor, if a natural person, resided or
      (B) in every jurisdiction within which the debtor, if other than a natural person, was incorporated or qualified to do business at the time the extension of credit was made.

   (2)  The extension of credit was made at a rate of interest in excess of an annual rate of 45 per centum calculated according to the actuarial method of allocating payments made on a debt between principal and interest, pursuant to which a payment is applied first to the accumulated interest and the balance is applied to the unpaid principal.

   (3)  At the time the extension of credit was made, the debtor reasonably believed that either
      (A)  one or more extensions of credit by the creditor had been collected or attempted to be collected by extortionate means, or the nonrepayment thereof had been punished by extortionate means; or
      (B) the creditor had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof.

   (4)  Upon the making of the extension of credit, the total of the extensions of credit by the creditor to the debtor then outstanding, including any unpaid interest or similar charges, exceeded $100.

(c)  In any prosecution under this section, if evidence has been introduced tending to show the existence of any of the circumstances described in

18

subsection (b)(1) or (b)(2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing the understanding of the debtor and the creditor at the time the extension of credit was made, the court may in its discretion allow evidence to be introduced tending to show the reputation as to collection practices of the creditor in any community of which the debtor was a member at the time of the extension.

The relevant language in Section 894 is the following:

(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or
(2) to punish any person for the nonrepayment thereof, shall be [punished]

[An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person. 18 U.S.C. §891(7)].

(b) In any prosecution under this section, for the purpose of showing an implicit threat as a means of collection, evidence may be introduced tending to show that one or more extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means or that the nonrepayment thereof was punished by extortionate means.

(c) In any prosecution under this section, if evidence has been introduced tending to show the existence, at the time the extension of credit in question was made, of the circumstances described in section 892(b)(1) or the circumstances described in section 892(b)(2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing that words or other means of communication, shown to have been employed as a means of collection, in fact carried an express or implicit threat, the court may in its discretion allow evidence to be introduced tending to show the reputation of the defendant in any community of

19

which the person against whom the alleged threat
was made was a member at the time of the collection
or attempt at collection.

A substantive violation of Section 892 requires proof of an extension of credit; that both the creditor and debtor actually understood that harm to the debtor could result from default or delinquency in repaying the loan to the defendant, and that the defendant acted knowingly, willfully and unlawfully. United States v. Nakaladski, 481 F.2d 289, 297 (5th Cir. 1973); United States v. Martorano, 557 F.2d 1, 7 (1st Cir. 1977); United States v. DeVincent, 546 F.2d 452, 456 (1st Cir. 1976).

A substantive violation of Section 894 requires proof of the existence of a debt; that the defendant used extortionate means to collect, attempt to collect, or punish nonrepayment of the debt; and that the defendant acted knowingly. United States v. Natale, 526 F.2d 1160 (2nd Cir. 1975); United States v. Joseph, 781 F.2d 549, 553 (6th Cir. 1986); United States v. Touloumis, 771 F.2d 235, 238 (7th Cir. 1985).

In order to prove a Section 894 conspiracy the government must prove 1) the existence of an agreement to use extortionate means to collect a loan and 2) that it was the intent of the defendant to use threats and/or actual violence when necessary to collect the extension of credit from the debtor. United States v. Nakaladski, 481 F.2d 289, 298 (5th Cir. 1973); United States v. Martorano, 557 F.2d 1, 8 (1st Cir. 1977); United States v. Smith, 464 F.2d 1129, 1134 (2d Cir. 1972)(proof of an overt act not required); United States v. Sears, 544 F.2d 585, 588 (2d Cir. 1976)(government not

20

required to prove that defendants planned to actually harm the debtor, only that they intended the debtor be put in fear of physical harm). <u>But see</u>, <u>United States v. Rizzo</u>, 373 F. Supp. 204, 206 (S.D.N.Y. 1973), <u>aff'd</u> 493 F.2d 1399 (2d Cir. 1974)(proof of overt act required).

The crimes proscribed by Sections 892 and 894 are commonly referred to as loansharking. The First Circuit has defined loansharking as "a term of criminal art which may roughly be defined as the unlawful lending of money at usurious rates of interest, repayment being encouraged by the employment (or threatened employment) of unorthodox collection measures, involving, <u>inter alia</u>, the breaking of bones." <u>United States v. Cintolo</u>, 818 F.2d 980, 984 (1st Cir. 1987). <u>See United States v. Zannino</u>, 895 F.2d 1, 4 n.4, (1st Cir. 1990) ("Loansharking," sometimes called "shylocking" is a term of criminal art which may roughly be defined as the unlawful lending of money at usurious rates of interest, repayment being encouraged by the use (or threatened use) of unorthodox, often violent, collection measures).

The statutes make it a crime to collect a loan with the use of violence, or an express or implicit threat of the use of violence; or to extend a loan where the understanding of the parties is that the failure to repay the loan could result in the use of violence.[5] Clearly, the government does not have to demonstrate that violence

---

[5]The statutes encompass wholly intrastate extortionate activities. <u>United States v. Muscarella</u>, 585 F.2d 242 (7th Cir. 1978); <u>United States v. Cheiman</u>, 578 F.2d 160 (6th Cir. 1978).

was ever used because the use of violence and even express threats of violence are practices of last resort in the loansharking business which generally trades upon the reputation of its employees and, therefore, normally need resort simply to the use of implicit threats. <u>United States v. Dennis</u>, 625 F.2d 782, 803 (8th Cir. 1980) (fear not an element of statute and proof of express threats not required). That loansharks seldom have to resort to the use of violence is borne out by the reported cases. <u>United States v. Annoreno</u>, 460 F.2d 1303 (7th Cir. 1972) involved a conspiracy to violate Section 892(a) and in that case twenty-six victims testified that on one or more occasions they borrowed money from the defendants. The court observed

> <u>All but four of the borrowers testified that they understood when they procured a loan that they or a member of their family could be hurt if they failed to met the repayment schedule. Their understanding of what might happen if they failed to repay the loans was often implied from the circumstances surrounding the transactions,</u> but there was substantial testimony that defendants frequently coupled their loans with express admonitions against default... In two cases, these threats of physical violence were followed by actual violence.

<u>Id</u>. at 1306. (Emphasis added).

The term "extortionate extension of credit" is defined in 18 U.S.C. Section 891(6) as "any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person." The term understanding has been defined by the Court in

22

United States v. Annoreno, supra, 460 F.2d at 1308-09 as follows:

> The term "understanding" as used in this statute should not, as defendant's argue, be interpreted as requiring an agreement. Rather, it should be given its primary meaning of comprehension. Clearly, Congress could not have intended to punish only those loan sharks foolish enough to make the terms of the loan explicit and to exempt those who convey the nature of the transaction by subtle hints and innuendo. Where the threat of violence exists and is comprehended by the victim, the extortionate nature of the transaction is present and punishable under this statute.

United States v. Dennis, supra, 625 F.2d at 803; United States v. DeVincent, supra, 546 F.2d at 454-56.

The courts have liberally interpreted the phrase "extension of credit" to include any agreement to defer repayment of a debt." United States v. Horton, 676 F.2d 1165, 1171 (7th Cir. 1982); United States v. Dennis, supra, 625 F.2d at 803. Compare United States v. Boulahanis, 677 F.2d 586, 590 (7th Cir. 1982). Neither failure to actually transfer the money to the debtor nor a failure to charge interest exempts the transaction from the statute. See United States v. Totaro, 550 F.2d 957, 959 (4th Cir. 1977); United Stated v. Andrino, 501 F.2d 1373, 1377 (9th Cir. 1974).

If the government is able to demonstrate that an extension of credit is extortionate in nature, then if the defendant collects or accepts payments on that loan, he has violated Section 894 by "participant[ing] ... in the use of ... extortionate means.... to collect [an] extension of credit." 18 U.S.C. § 894(a). United States v. Dennis, supra, 625 F.2d at 803; United States v. Nakaladski, supra, 481 F.2d at 298. Therefore, if the defendant either made an extension of credit, was present when it was made,

23

or has knowledge of the <u>modus operandi</u> of the loansharking business (i.e.: extending loans in which the understanding of the parties was that default in payment could result in violence), then any collection of that debt involves an implicit threat of the use of violence and is a violation of Section 894(a).  <u>Id</u>.

The extortionate understanding can be proved by the borrower's testimony that at the time of the loan he realized that harm could come to him if he failed to repay the loan, that the loanshark victim actually feared the loanshark, or that implicit or explicit threats were made to the borrower.  However, it is not necessary to prove that the creditor and debtor had an agreement that such violence or harm could result from the failure to repay the loan, or that explicit threats of harm or violence were made by the creditor.  The government need only prove that the creditor and the debtor had an "understanding" or "comprehension" that violence or other criminal means could result from the failure or delay in making repayment.

The First Circuit has held that "[t]he term 'understanding' as used in this Section, is not limited to a mutual agreement.  The term includes cases where it is recognized by the parties that illegal means or violence will be used to collect the debt." <u>United States v. Lamattina</u>, 889 F.2d 1191, 1193 (1st Cir. 1989). Further, even though the statute requires that the understanding exist at the time the loan is made, evidence of threats or actual violence subsequent to the making of the loan is relevant to prove the understanding of both the borrower and the lender at the time

the loan was made that violence could result from the failure to repay the loan. United States v. Martorano, supra, 557 F.2d at 7; United States v. Lamattina, supra, 889 F.2d at 1193.

Because Congress realized that direct evidence of the creditor's understanding would be difficult to obtain, Section 892(b) states that there is prima facie evidence that an extension of credit is extortionate if:  the repayment is unenforceable through normal judicial processes; the interest rate of the loan exceeds 45 percent per year; the amount of the loan exceeds $100; and the borrower reasonably believed either that the lender had used extortion to collect other debts or that the lender has a reputation for doing so. United States v. Zannino, supra, 895 F.2d at 22 (the statute creates a rebuttable presumption, triggered by proof of the statutory factors). United States v. DeVincent, supra, 546 F.2d at 454; United States v. Dennis, 625 F.2d at 800); United States v. Martorano, supra, 557 F.2d at 7, (constitutional to allow jury to infer from the existence of the four factors in § 892(b) that the lender understands that nonrepayment will result in the use of violence).

The First Circuit held that the prima facie case can be "established by objective evidence verifying the existence of the first three factors; by [the loanshark victim's] testimony as to his beliefs; and by a demonstration, founded upon the totality of the evidence, that [the victim's] fears were reasonable under the circumstances." United States v. Zannino, supra, 895 F.2d at 22. The evidence used in the Zannino case to prove the fourth element

25

of the prima facie case was the loanshark victim's knowledge of the loanshark collector's reputation for violence, the defendant's connection to organized crime, and his testimony that he <u>could</u> be threatened with physical harm if he failed to repay the loan. <u>Id</u>. at 23. Therefore, the government should be allowed to use these types of evidence in this case to prove that the debtor reasonably believed that the lender either had used extortionate means to collect other debts or had a reputation for doing so. 18 U.S.C. § 892(b).

Evidence that the defendant understood that violence would be used against a loanshark victim upon default in the repayment of the loan is not limited by the prima facie case outlined in Section 892(b). The understanding of both the creditor and the debtor can be proven by the totality of the evidence including the defendant's own tape recorded statements, the nature of the loan including the usurious rate of interest, the fact that no collateral was required, that no papers were signed, that the loans and interest payments were made at the defendant's home or work, and any other relevant evidence. <u>United States v. Martorano</u>, <u>supra</u>, 557 F.2d at 7; <u>United States v. Gigante</u>, 729 F.2d 78, 80, 83 (2nd Cir. 1984); <u>United States v. Dennis</u>, <u>supra</u>, 625 F.2d at 801-803; <u>United States v. DeVincent</u>, <u>supra</u>, 546 F.2d at 456-57. The jury can infer from the totality of the evidence that the average creditor and borrower would understand the extortionate nature of the loans. <u>United States v. Annoreno</u>, <u>supra</u>, 460 F.2d at 1309; <u>United States v. Dennis</u>, <u>supra</u>, 625 F.2d at 803; <u>United States v. Martorano</u>, <u>supra</u>,

26

557 F.2d at 7.

The government may prove the extortionate understanding of the creditor, and in some cases the borrower, by circumstantial evidence because the fear involved in loansharking cases is usually caused by implicit rather than explicit threats and most loanshark victims are unwilling or reluctant to testify.  The circumstantial evidence most often relied upon in loansharking cases is reputation evidence and evidence of prior bad acts.  In loansharking cases, as in all cases, the Court must balance the prejudicial effect of this evidence against its probative value.  Fed.R. of Evid. 403.  However, the use of reputation and prior bad acts evidence is essential to show the state of mind of the creditor and the borrower.  The use of "[r]eputation evidence is often admissible because, without it, the prosecution could not prove the extortionate 'understanding.'  Reputation evidence may be used to show the state of mind of both the defendant and the victim......  prior acts evidence likewise is admissible to show the victim's fear and its reasonableness." United States v. Dennis, supra, 625 F.2d at 800.  Further, the jury can infer that the creditor was aware of his own reputation and relied upon it to instill fear in the victims to induce them to repay the loans.

Section 892(b) allows for the admission of reputation evidence to prove that the defendant had a reputation for the use of extortionate means to collect extensions of credit.  This is so because direct evidence of the defendant's understanding of the loan is seldom available and because the victim's understanding of

27

the nature of the loan "is one of the factors from which the jury may infer the lender's intent." <u>United States v. Martorano,</u> <u>supra</u>, 557 F.2d at 8 n.3. Section 892(c) also allows for the admission of reputation evidence in order to prove the understanding of the borrower and the defendant at the time the loan was extended. Finally, Section 894(c) permits the use of reputation evidence to prove that words used as a means of collection carried an express or implicit threat.

With respect to the borrower's state of mind, the government meets its burden where the record as a whole discloses a reasonable basis for fear on his part that default or delinquency might result in harm to him or his family. <u>United States v. Annoreno</u>, <u>supra</u>, 460 F.2d at 1309.

A "friendly" relationship between the loanshark and his victim does not preclude conviction. Even where the victim denies at trial that he was ever threatened or put in fear, the government may prove the extortionate understanding through reputation evidence and evidence of prior bad acts. <u>United States v. Dennis</u>, <u>supra</u>, 625 F.2d at 803. <u>See</u> <u>United States v. Spears</u>, 568 F.2d 799, 801 (10th Cir. 1978); <u>United States v. DeLutro</u>, 435 F.2d 255, 256 (2d Cir. 1970).

The admission of reputation and prior bad acts evidence is essential to prove the extortionate "understanding" required in Section 892 and is allowed by Section 892(b) and Section 894(c). Reputation evidence is especially necessary where, as here, the defendants traded heavily upon the debtors' knowledge that the

28

lenders were associated with members of organized crime.[6]

The Courts have allowed the admission of a wide range of prior bad acts and reputation evidence in loansharking cases.  The First

---

[6]    The use of reputation evidence in Sections 892(c) and 894(c) is conditioned by the language "direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available."  The government is not required to show that the debtor is unavailable to testify as to the understanding of the parties to the loan, but rather the reputation evidence is admissible simply upon a showing that it would be relevant to the state of mind of the creditor and debtor, and that the debtor is afraid or unwilling to provide direct testimony regarding this issue.  The <u>Dennis</u> Court held that

> These ECT provisions could be read as restricting the use of character evidence to certain limited situations where direct evidence of the actual belief of the debtor is unavailable.  <u>The legislative history, however, clarifies that Congress intended reputation evidence to be before the trier of fact whenever it would be relevant to the state of mind of the parties</u>... Because Congress obviously intended to facilitate proof in these cases, courts have rejected unavailability as a prerequisite to the admission of reputation evidence... In addition § 894(c) allows evidence of prior conduct to establish that collection practices were extortionate.

<u>United States v. Dennis, supra</u>, 625 F.2d at 801 (citation omitted)(emphasis added).

The Court continued by noting that some courts have determined that a loanshark's victim is unavailable within the meaning of Sections 892(c) and 894(c) if he or she is afraid or unwilling to testify.  <u>Id</u>. at 801 n.10. In the same footnote the Court found further support for the use of reputation evidence in the Congressional Record which stated "[t]he major difficulty which confronts the prosecution of offenses of this type is the reluctance of the victims to testify.  That is, if they are in genuine fear of the consequences of nonpayment, they are apt to be equally or even more in fear of the consequences of testifying as a complaining witness."  <u>Id</u>. quoting Conf. Rep. No. 1397, 90th Cong., 2d Sess., 2 [1968] U.S. Code Cong. & Admin. News, p.2026. The prejudicial effect of such testimony can clearly be minimized by a limiting instruction to the jury.  <u>United States v. Dennis</u>, <u>supra</u>, 625 F.2d at 801.

29

Circuit in <u>United States v. DeVincent</u>, <u>supra</u>, 546 F.2d at 456 upheld the use of testimony regarding the defendant's twenty year old conviction for armed robbery, ten year old murder indictment, prior conviction for loansharking and reputation as a "head-crusher, loanshark enforcer." The statements were not admissible to show that the defendant was a bad person, but rather, "[i]f known to the debtor....... they [were] ... admi[ssible] to show an element of the crime - the understanding of the debtor that default would be punished with violence. The debtor's awareness of the lender's earlier conviction, or even indictment, for a violent crime surely affects his view of the lenders likely collection practices." <u>Id</u>. at 456-57. The testimony regarding the prior conviction and indictment were in response to a question regarding the debtor's knowledge of the loansharks at the time of the loan and the Court instructed the jury that the testimony was limited to the borrower's state of mind regarding fear of failure to repay the loan. <u>Id</u>.

Similarly, the First Circuit in <u>United States v. Oreto</u>, 37 F.3d 739, 749 (1st Cir. 1994), relying upon it's ruling in <u>DeVincent</u>, upheld testimony regarding the fact that the loanshark had been convicted of murder. One borrower testified that he knew the defendant "got out of jail for murder." <u>Id</u>. The evidence "was admitted by the trial court solely for the purpose of showing a basis for [the borrower's] fears that [the lender] might resort to violence to ensure repayment." <u>Id</u>. The Court held

> DeVincent clearly holds that a prior conviction for a violent crime-even one wholly

30

>  unrelated to the defendant's lending
>  activities-may, if known to a debtor,
>  influence the latter's reasonable expectations
>  as to how the lender may collect the loan. It
>  is true that the ETC statue itself permits
>  reputation evidence-usually a reputation for
>  violence-in more restricted situations. See
>  18 U.S.C. §§ 892(c), 894(c). But these
>  provisions do not explicitly bar evidence of
>  specific prior bad acts, as permitted under
>  Fed. R. Evid. 404(b), when offered to show the
>  basis for a victim's fear, and cases besides
>  DeVincent have followed that course. The
>  weighing of prejudice against probative value
>  is otherwise largely for the trial court, ...
>  and no abuse of discretion has been shown
>  here.

Id. At 750.

The Court also upheld in United States v. Martorano, supra, 557 F.2d at 6, reputation testimony that the defendant was a loanshark and that he was "100 percent in getting his collections back... Nobody missed. If they did, they got hurt." This testimony was also admitted subject to the limitation that it be considered only as to the victim's state of mind. Further, the Court held that the reputation testimony was admissible without a voir dire prior to its introduction. The Court stated that there is no requirement at common law that any preliminary determination be made regarding the reasonableness of a witness' answer regarding reputation questions and that the only foundation required for admission of the evidence is that the witness resided and worked in the same community as the defendant and that the witness is familiar with the defendant's reputation. Id. at 9. The Court concluded that "the admission of the reputation evidence was authorized by § 892, and it does not purport to create a contrary

31

rule."  <u>Id</u>.

The <u>Nakaladski</u> Court upheld the admission of testimony by a loanshark victim that a defendant "had been involved in a shooting" and that another victim was told that the money he had borrowed "came from underworld elements, Mafia, and so forth."  <u>United States v. Nakaladski</u>, <u>supra</u>, 481 F.2d at 299 and 301.  The Court held that the witness' use of the term Mafia "was quite relevant in showing [the defendant's] intent to put [the borrower] in fear and in showing the method of operation of the conspiracy" and that the probative value of such evidence outweighed any prejudice.  <u>Id.</u> at 301.

The Second Circuit in <u>United States v. Gigante</u>, 729 F.2d 78 (2nd Cir. 1984) upheld the use of testimony by a loanshark victim that the defendant was a loanshark who was connected to organized crime.  The Court held that the testimony was admissible pursuant to Section 892(b)(3) because "[e]vidence that the debtor believed the loanshark was connected to organized crime is admissible to show the debtor's belief that the loanshark would use, or had a reputation for using, extortionate means to collect extensions of credit."  <u>Id</u> at 83.  The Court also held that the use of evidence of the defendant's loans to individuals not named in the indictment was proper to show the "scope of the conspiracies charged in the indictment ... and to show the reasonableness of [the borrower's] fear of [the defendant]."  <u>Id</u>.

As stated above, fear is not an element of either Section 892 or Section 894, and in fact the government is not required to prove

that the defendant used express threats. Even if a loanshark victim denies that threats were made or that he was in fear of the loansharks, the government can still establish the extortionate understanding with the use of other evidence. <u>United States v. DeLutro</u>, 435 F.2d 255, (2nd Cir. 1970); <u>United States v. Natale</u>, <u>supra</u>, 526 F.2d at 1168 (actual fear need not be generated, so long as the defendant intended to take action which would reasonably induce fear in an ordinary person, it is the conduct of the defendant, not the victim's state of mind which is relevant). Among the other evidence from which a trier of fact can find an extortionate understanding is testimony regarding the loanshark victim's reasonable belief that the loanshark had used extortionate means to collect loans in the past or had a reputation for doing so, pursuant to section 892(b); or if such direct evidence is "unavailable", reputation evidence may be introduced to establish the loanshark's collection practices pursuant to Section 892(c).

The loanshark victim's fear of testifying against the loanshark is well documented in the Congressional Record and is in part responsible for the enactment of Sections 892 and 894. This fear causes the borrowers to be at least reluctant to testify, and at worst to change their prior testimony and deny that they were ever threatened or were afraid of the loansharks. The loanshark victim in this case will testify as to the extortionate nature of his loan and the collection of the loan. However, because there was no explicit agreement that extortionate means would be used to collect the loan, the victim will testify as to his knowledge of

33

the use by the defendant of extortionate means to collect other loans and to the defendant's reputation for the use of extortionate means in collecting the loans.

The government will be able to prove the violations of Sections 892 and 894 even in the event that the victim denies that he was afraid because "[i]t is well established that even with outright denials of threats or fear, the jury may infer from other testimony and other evidence that the extortionate understanding existed." United States v. Dennis, supra, 625 F.2d at 803; United States v. Nakaladski, supra, 481 F.2d at 299; United States v. DeLutro, supra, 435 F.2d at 257. This other evidence and testimony can be the victim's grand jury testimony, the defendant's own loanshark records, other testimony by the victim, testimony by other victims of the loanshark, recorded conversations between the defendant and the loanshark victim, his demeanor at trial, testimony regarding fear of potential harm to family members, and third party evidence by other witnesses that the loanshark had used extortionate means in collecting the loan from the victim. 18 U.S.C. §§ 892(c) and 894(c); United States v. Dennis, supra 625 F.2d at 801; United States v. Nakaladski, supra, 481 F.2d at 299; United States v. DeLutro, supra, 435 F.2d at 257.

The use of extortionate means may be proved by showing any of the following: (1) the defendant collected or attempted to collect an extortionate loan (2) the defendant made an implicit threat; (3) the defendant made an explicit threat; or (4) the defendant used violence or other criminal means. United States v. Dennis, supra,

34

625 F.2d at 803; <u>United States v. Ochs</u>, 595 F.2d 1247, 1261 (2d Cir. 1979).

The First Circuit has held that evidence of "implicit threats suffice under the express terms of the statute" to show that extortionate means were used. <u>United States v. Weiner</u>, 3 F.3d 17, 21 (1st. Cir. 1993). The Court held that "by their very nature criminal conspiracies are masked, and veiled threats are the hallmark of intelligent extortion." <u>Id.</u> at 24.

The Court has also held in <u>United States v. Oreto</u>, 37 F.3d at 752 that "the debtor's subjective fear is not itself an element of the offense under 18 U.S.C. § 894, although actual fear may be pertinent evidence. 'It is the nature of the actions of the person seeking to collect the indebtedness, not the mental state produced in the debtor, that is the focus of the inquiry for the jury.'" Citation omitted. In that case the implicit threats included the nature of the loan, the usurious interest rate and the fact that collectors were sent to the borrowers place of work. The Court concluded "[a]fter a reading of the testimony as to the visit [by three collectors to the borrower's workplace], we think that a reasonable jury could determine that the nature of the loan, its interest rate, and the appellants' collection methods were not the sort commonly employed by legitimate lenders, and that the appellants' tactics carried an implicit threat of violence." <u>Id</u>. at 753.

The requirement that the defendant act "knowingly" is satisfied where it is established that he intended that the victim

35

be placed in fear.  It is not necessary to prove that the defendant intended to harm the victim.  United States v. Sears, 544 F.2d 585 (2d Cir. 1976).

Evidence of prior collections, or attempts to collect, extensions of credit by extortionate means is admissible to show use of an implicit threat as a means of collection where such prior acts were known to the person against whom the implicit threat was alleged to be made.  18 U.S.C. § 894(b).  In addition, where direct evidence is unavailable, in order to show that words or other means of communications used as a means of collection did in fact carry an express or implicit threat, the court has discretion to allow evidence of reputation.  18 U.S.C. §894(c).  Such evidence is also admissible when relevant to the state of mind of the parties.  United States v. Dennis, supra, 625 F.2d at 801.  See United States v. Martorano, supra, 557 F.2d at 8 n.3 (evidence of victim's mental state, though not an element of a conspiracy to violate Section 892, is one of the facts from which the lender's intent may be inferred).

The loanshark victim's fear of the loansharks can result in the victim recanting his grand jury testimony regarding the loan and the collection of payments.  The government can impeach such recalcitrant witnesses with their own grand jury testimony which may be allowed as substantive evidence.  United States v. Dennis, supra, 625 F.2d at 792.

Preliminarily, the government can impeach its own witness. Fed. R. Evid. 607.  The use of a witness' own statements made in

36

the grand jury to impeach a witness who is afraid of a defendant or hostile to the government is essential in the prosecution of loansharking violations.  United States v. Dennis, supra, 625 F.2d at 795 n.6 (the government's ability to impeach its witnesses with prior inconsistent statements is crucial where the turncoat witness is afraid or hostile).  The witness' statements given under oath in the grand jury are not hearsay pursuant to Fed. R. Evid. 801 (d)(1)(A) .  The victim's grand jury testimony is admissible "even if the statements were elicited by means of leading questions." Id. at 795.

Inconsistent statements include not only statements which are in direct contradiction of each other but also includes answers which are evasive, silence, the inability to remember, and a change in the witnesses position.  The prior inconsistent statements may be allowed by the Court as substantive evidence.  Id., United States v. Coran, 589 F.2d 70, 76 (1st Cir. 1978); United States v. Hemmer, 729 F.2d 10, 17 (1st Cir. 1984).  The foundation necessary for the admission of prior inconsistent statements is that the witness must be allowed to explain or deny the statement and the defendant must be able to cross-examine the witness regarding the statement.  Id. The government can read the prior inconsistent statement to the jury if the witness denies making the statement. Id.

Finally, the First Circuit has upheld convictions in loanshark cases where the borrower did not testify.  Oreto, 37 F.3d at 752. In that case the borrowers' voices were identified on tape

37

recordings by law enforcement agents, documentary evidence of the loans was introduced at trial, and a cooperating co-conspirator testified about the lender's efforts to collect the loans.  Id.

IV.    THE USE OF AN EXPERT WITNESS REGARDING LOANSHARKING

FBI Special Agent Michael A. Campi will testify as an expert witness concerning loansharking.  Special Agent Campi will testify concerning the modus operandi of loansharks, as well as loansharking terminology and the interest rate involved in the loan made by the defendant in this case.

A trial Court is vested with broad discretion to admit such expert testimony, and decisions to do so have been widely upheld. See, e.g., United States v. Lamattina, supra, 889 F.2d at 1194; United States v. Ladd, 885 F.2d 954, 959 (1st Cir. 1989); United States v. Angiulo, 847 F. 2d 956, 975 (1st Cir. 1988); Coleman v. DeMinico, 730 F.2d 42, 45 (1st Cir. 1984); United States v. Fleishman, 684 F.2d 1329, 1335 (9th Cir. 1982).

Under Rule 702, Fed. R. Evid., a witness may be qualified as an expert "by knowledge, skill, experience, training, or education."  Fields of knowledge for which experts may be used are not limited to only scientific and technical, but also include any specialized knowledge. See, e.g., United States v. Johnson, 575 F.2d 1347, 1360-1362 (5th Cir. 1978); Soo Line R.R. Co. v. Fruehauf Corp., 547 F.2d 1365, 1377 (8th Cir. 1977).  Moreover, Rule 702 "is to be broadly interpreted." Mannino v. Intern. Mfg. Co., 650 F.2d

38

846, 849 (6th Cir. 1981).[7]

As noted, expert testimony is not restricted to only scientific or technical fields, and its admissibility "does not depend on the relative certainty of the subject matter of testimony... [or on] the relative weakness or strength of the factual underpinning of the expert's opinion... " <u>Taenzler v. Burlington Northern</u>, 608 F.2d 796, 798 n.3 (8th Cir. 1979). <u>Accord</u>, <u>Coleman v. DeMinico</u>, <u>supra</u>, 730 F.2d at 47. Rather, Rule 702 explicitly permits expert testimony where any "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."

Accordingly, the Courts have repeatedly upheld the admission of expert testimony concerning the structure and <u>modus operandi</u> of criminal enterprises, their terminology, and identifying the roles of defendants in such criminal enterprises, as well as stating an opinion that the defendant's conduct and statements indicated that he was engaged in the charged criminal conduct. <u>See</u>, <u>e.g.</u>, <u>United States v. Weiner</u>, 3 F.3d 17, 21 (1st Cir. 1993)(FBI agent testified as expert in loansharking); <u>United States v. Lamattina</u>, <u>supra</u>, 889 F.2d at 1193-94 (FBI agent's expert testimony based on tape recorded conversations in loansharking case regarding <u>modus operandi</u> of loanshark operations, meaning of code words used in

---

[7]Rule 702 Fed. R. Evid., provides as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

conversation, and that recorded conversations involved loansharking transactions necessary because without the testimony the jury probably would not have been able to understand the evidence); United States v. Angiulo, 847 F.2d at 973-975 (FBI Agent's expert testimony based on tape recorded conversations about the structure and nature of an organized crime family and that the defendants and other conspirators were members and close associates of the organized crime family); United States v. Ardito, 782 F.2d 358, 363 (2d Cir. 1986); (Expert testimony explaining organized crime terms "capo," "regime," and "crew"); United States v. Riccobene, 709 F.2d 214, 230-231 (3d Cir. 1983)(FBI Agent's expert testimony explaining organized crime terms "La Cosa Nostra," "capo," and "consigliere"); United States v. Scavo, 593 F.2d 837, 840, 843-844 (8th Cir. 1979) (FBI Agent's expert testimony about "the nature of gambling operations, gambling terminology, and his opinion as to [the defendant's] role in [the] bookmaking operation"); United States v. Mason, 582 F.2d 961, 964 (5th Cir. 1978); (FBI Agent's expert testimony that the defendant's recorded conversations involved bookmaking activities, explaining bookmaking terminology in the recorded conversations, and opinion identifying the defendant as a "sub-bookmaker" working for a commission, calling in betting wagers to the main recording center, and is in fact not a mere player); United States v. Milton, 555 F.2d 1198, 1203-1204 (5th Cir. 1977) (Expert testimony that the defendants' recorded conversations involved unlawful bookmaking activities).

Under the foregoing authority, the Court should allow Special

40

Agent Campi to testify concerning loansharking modus operandi, the interest rate involved in the loan in this case and specific terminology used in this case.  The foregoing authority also makes clear that an expert may express an opinion whether or not the defendant was engaged in the charged criminal conduct.

V.   CONCLUSION

Therefore, the Court should allow the introduction of the evidence described above for the reasons set forth herein.


Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Todd E. Newhouse
     _____
     TODD E. NEWHOUSE
     Assistant U.S. Attorney

CERTIFICATE OF SERVICE

Hampden,  ss.                    Springfield, Massachusetts
                                 June 2, 2006

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                 /s/ Todd E. Newhouse
                                 _____
                                 TODD E. NEWHOUSE
                                 Assistant U.S. Attorney

41